Filed 2/4/16  P. v. Sandoval CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050543 |
| v. | (Super. Ct. No. 11ZF0125) |
| RICHARD STANLEY SANDOVAL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

Defendant Richard Stanley Sandoval appeals from the judgment entered after a jury found him guilty of the first degree murder of an 84-year-old woman in 1984. The jury found true the special circumstance allegation that the murder was committed during the commission or attempted commission of a rape.

We affirm. Substantial evidence showed Sandoval raped or attempted to rape his victim in the commission of her murder. Therefore, substantial evidence supported both the jury's true finding of the special circumstance allegation and the trial court's felony-murder jury instruction.

## SUMMARY OF TRIAL EVIDENCE

Our summary of facts is limited to those facts relevant to the issues raised on appeal.

### I.

TRIAL EVIDENCE OF THE CHARGED OFFENSE AND SPECIAL CIRCUMSTANCE ALLEGATION

In 1984, 84-year-old Margaret Lenney owned an apartment building in Anaheim. She lived alone in one of the units and rented out the remaining ones.

During the morning of September 23, 1984, in response to a call, Officer Paul Zavala of the Anaheim Police Department observed Lenney's body on the front porch of her apartment. Her shirt had been pulled up around her neck, exposing her breasts. Her pants and underwear had been pulled off.

Zavala observed several injuries to Lenney's face and upper chest area. It appeared to Zavala that shoe print patterns were impressed on her face and chest area. That shoe print pattern appeared similar to a shoe print pattern in paint, which Zavala observed on the concrete in the area between Lenney's feet.

The autopsy performed on Lenney's body showed she had suffered "multiple blunt-type injuries" that included abrasions, contusions, and lacerations "throughout the entire head and face" and on her neck and chest. Her skull had been fractured and she had intracranial hemorrhages at "two separate levels" in her brain connected with "significant blunt trauma" to her head.

Every one of Lenney's ribs, "on both sides, front and back," was fractured, as was her spine. Her lungs were bruised. Lenney had suffered lacerations of the liver, spleen, and right lung. The injuries to Lenney's head and chest were consistent with those that might be inflicted by a 200-pound man using his foot to stomp on a woman's head and chest while she was lying on concrete. Lenney died from those multiple blunt traumatic injuries; her death "would have taken some time" and was painful.

There were also abrasions on both sides of Lenney's throat, which were consistent with "manual compression that might cut off the air flow." Lenney had abrasions on the inside of her left arm, which were consistent with her arms being forcibly held down.

Lenney had suffered a rectal hemorrhage "consistent with rectal penetration or insertional-type trauma." There were two cuts on her left fingers consistent with defensive wounds that might be suffered in an attempt to ward off an attack.

Detective Michael Lopez of the Anaheim Police Department also responded to Lenney's apartment on September 23, 1984, and saw the style of "zigzag" shoe prints on Lenney's chest and also in paint on the walkway next to Lenney's body. He set out to find "anybody who was associated with the painting of Margaret Lenney's apartment" and, based on his investigation, specifically sought to locate Sandoval.

At 7:00 a.m. on September 24, 1984, Lopez and Detective Duane Goetz saw Sandoval walking on a street, but because they did not realize he was who the detectives were looking for, they did not contact him. When Lopez received information later that morning that Sandoval was wearing dark pants and a gray sweater, and saw

3

Sandoval again at 8:00 or 8:30 a.m., he realized Sandoval was the man they were looking for and contacted him.

Lopez told Sandoval that he and Goetz were investigating a homicide of an elderly woman. Sandoval said nothing and appeared unconcerned. Lopez asked Sandoval if he had done any painting for Lenney at her residence. At first, Sandoval stated he did not know what Lopez was talking about, but eventually acknowledged he had done some painting for her.

Lopez asked Sandoval if he had been in contact with Lenney on Saturday night (September 22). Sandoval stated he was walking by Lenney's apartment when she came outside to ask him a question regarding some money she owed him for the paint job he had completed. Lopez asked Sandoval how he came to be in the area that morning when the detectives contacted him. Sandoval said he had just arrived in the area by bus, shortly after 8:00 a.m. When Lopez confronted Sandoval with the information that he and Goetz had seen Sandoval in the area an hour earlier, Sandoval responded, "I don't give a fuck what you think." Lopez arrested Sandoval.

During the booking process, a small pocketknife with some blood on it was found among Sandoval's personal property. As DNA testing was not available at the time, charges were not filed against Sandoval in 1984, and he was released.

Later testing of the blood on the pocketknife showed Lenney's DNA profile matched the major contributor of the DNA found in the sample. That DNA profile could be expected to occur randomly in fewer than one in one trillion unrelated people. Sandoval's DNA profile matched the DNA of the minor contributor of the sample; that profile would be expected to occur randomly in fewer than one in 40 billion people.

Swabs had been collected from Lenney's vaginal area and from "white material" that "[l]ooked like it was dried fluid," which was collected from the ground underneath Lenney's buttocks. Examination of the swabs did not show the presence of spermatozoa. Danielle Wieland, a DNA analyst working for the Orange County crime

4

laboratory, performed "Y chromosome D.N.A. typing" of DNA contained in the substances collected on the swabs. She testified that "Y chromosome typing is a special type of typing that's used to only copy or look at the Y or the male chromosome. This is used usually in cases where there is an excessive or large amount of female D.N.A., and the interest is solely in the male D.N.A. present. It will not type or copy any of the female D.N.A., it will only type the male D.N.A." (Wieland explained that in instances "where the male doesn't ejaculate and there is no spermatozoa," there is "[t]ypically, less" DNA contributed by the male in a sample collected from a vaginal swab.)

Wieland stated that Y chromosome testing showed the "Y haplotype" found in the material collected from the vaginal swab taken from Lenney matched Sandoval's haplotype. "[A]pplying a 95-percent confidence interval," she stated such a Y haplotype occurs in fewer than one in 5,000 unrelated people. She further stated that the substance collected from the dried fluid under Lenney's buttocks contained "a very low level partial Y haplotype," consistent with Sandoval's Y haplotype.

Wieland could not identify the source (e.g., a particular type of body fluid) from which the Y haplotype was recovered. She stated that with low amounts of DNA, she would not expect the source to be of a type that would contain a large amount of DNA, such as blood or a significant amount of saliva. She explained that it was possible such "touch" DNA could be found in a vagina "if a man inserted his penis but did not ejaculate" or if a man inserted his finger into the vaginal area.

II.

TRIAL EVIDENCE REGARDING SANDOVAL'S PRIOR AND SUBSEQUENT RAPE OFFENSES

The prosecution introduced evidence that in 1981, Sandoval raped Irene R. Irene R. testified that Sandoval, an acquaintance, had told her he was going to sell his car and wanted her to take a look at it. While they were in the car, Sandoval started kissing her neck. While she tried to resist his advances, he removed her shorts, touched her

5

genital area with his hands, and inserted his penis into her vagina.  The record does not reflect whether Sandoval was arrested or criminally prosecuted for that offense.

In November 1985, Sandoval was found guilty of three counts of forcible rape, one count of penetration with his fingers, one count of oral copulation, one count of false imprisonment, and one count of sexual battery, against Joyce D., all committed in July 1985; the jury also found true that Sandoval used a knife in the commission of some of those offenses, including two of the rape offenses.  The trial court in that case sentenced Sandoval to 24 years in prison.

## PROCEDURAL HISTORY

In October 2011, the Orange County Grand Jury returned an indictment accusing Sandoval of committing Lenney's murder, in violation of Penal Code section 187, subdivision (a).  The indictment alleged, pursuant to Penal Code section 190.2, subdivision (a)(17)(C), the murder was in the first degree because it was committed while Sandoval was engaged in the commission of, or attempted commission of, a rape, in violation of Penal Code section 261.

The trial jury found Sandoval guilty as charged and found true the special circumstance allegation that the murder was committed during the commission or the attempted commission of a rape.  The trial court sentenced Sandoval to life in state prison without the possibility of parole.  Sandoval appealed.

## DISCUSSION

Sandoval argues insufficient evidence supported the jury's true finding of the special circumstance allegation that in the commission of Lenney's murder, Sandoval raped or attempted to rape her.  He concomitantly argues the felony-murder instruction regarding rape, given to the jury, was not supported by sufficient evidence, thereby undermining his conviction for murder.  Sandoval's arguments are without merit.

6

## I.

### STANDARD OF REVIEW

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The testimony of a single witness, unless physically impossible or inherently improbable, is sufficient to support a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66 . . . .) '"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."' (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793 . . . .)" (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 879.)

## II.

### SUFFICIENT EVIDENCE SUPPORTED THE FINDING SANDOVAL RAPED OR ATTEMPTED TO RAPE LENNEY.

"Forcible rape is a general intent crime involving an act of sexual intercourse accomplished against the victim's will by means of force or fear. [Citation.]

7

An attempt to commit rape has two elements [citation]:  the specific intent to commit rape, and a direct but ineffectual act done towards its commission.  [Citation.]  Such act cannot be merely preparatory, and must constitute direct movement towards completion of the crime.  [Citation.]  However, attempted rape does not necessarily require a physical sexual assault or other sexually '"unambiguous[]"' contact.  [Citations.]"  (*People v. DePriest* (2007) 42 Cal.4th 1, 48.)  "Conviction of the crime of attempted forcible rape requires proof the defendant formed the specific intent to commit the crime of rape and performed a direct but ineffectual act, beyond mere preparation, leading toward the commission of a rape.  [Citations.]"  (*People v. Rundle* (2008) 43 Cal.4th 76, 138.)

In light of the trial evidence that Sandoval's DNA was found in Lenney's vagina and that Lenney suffered penetration-type trauma to her rectum, Sandoval argues that even if the trial evidence supported a finding that he committed some sexual assault upon Lenney, such as sexual penetration by instrument, the evidence was insufficient to support the alleged finding he had raped her, or tried to.  (See *People v. Holt* (1997) 15 Cal.4th 619, 676 [vaginal intercourse is required for the commission of rape]; *People v. Rundle*, *supra*, 43 Cal.4th at p. 140.)

As acknowledged by Sandoval, the presence of sperm or seminal fluid on a victim is not an element of rape.  (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1079 ["Ejaculation, however, is not an element of rape; all that is required is 'sexual penetration, however slight.'"].)  Here, substantial evidence showed Lenney was discovered lying on her back on her front porch with her pants and underwear pulled off and her shirt pulled up around her neck so as to expose her breasts.  Evidence was presented that Sandoval's DNA was found in Lenney's vagina and that such DNA could have been deposited there if Sandoval had inserted his penis into her vagina but did not ejaculate.  As stated in Sandoval's opening brief, evidence showed "Ms. Lenney's injuries were consistent with her being held down."  (See *People v. Rundle*, *supra*, 43 Cal.4th at p. 139 ["the combination of the nude state of [the victim]'s body and the

8

presence of physical restraint in this case provides stronger evidence that a forcible rape or attempted rape occurred than where the body simply is unclothed"].)

In addition to the physical evidence presented at trial, substantial evidence showed that Sandoval was a serial rapist. He had raped Irene C. before Lenney's murder, and was convicted of, inter alia, three counts of forcible rape against Joyce D., which occurred less than a year after Lenney's murder. We therefore conclude the physical evidence combined with the evidence of Sandoval's other rape offenses constituted substantial evidence to support the jury's true finding as to the rape special circumstance allegation and the felony-murder instruction given to the jury.

Sandoval argues that the physical evidence stops short of being sufficient to show a rape or attempted rape occurred, as opposed to the crime of his having digitally penetrated Lenney's vagina. Sandoval argues evidence was presented that the male DNA found in Lenney's vagina could have been deposited by inserting his finger into her vagina. He argues, "[a] more accurate characterization of the evidence is that a conclusion of digital penetration actually found more support in the evidence in light of Ms. Wieland's testimony about penile penetration leaving more than trace or touch DNA except if there was a lubricant or earlier touching—things about which the prosecutor adduced no evidence."

Wieland's testimony does not support Sandoval's argument. Wieland testified it was possible the type of DNA found in Lenney's vagina could be deposited in a woman's vagina if a man inserted his penis but did not ejaculate, and further testified that possibility "is especially dependent on what was used as a possible lubricant and any other touching that may have occurred before that." There was no evidence presented at trial regarding the presence or absence of any lubricant or, other than the above quoted statement by Wieland, the effect of the absence or the presence in any amount of a lubricant. Wieland did not testify that the type or amount of DNA found in Lenney's vagina was more likely to have been deposited by a man's finger than by the insertion of

9

a man's penis into her vagina. Sandoval's argument tacitly suggests that a rape conviction depends to some degree on evidence of the presence of spermatozoa or seminal fluid, which is an argument, as discussed *ante*, the California Supreme Court has squarely rejected.

Sandoval argues that he has committed touching offenses, including one count of penetration with his fingers against Joyce D., in support of his argument the evidence was insufficient to support a rape or attempted rape finding. As discussed *ante*, it was for the jury to evaluate all the evidence, including (1) the crime scene photographs, showing Lenney's body's position and state of undress, (2) testimony that her injuries were consistent with her being held down, and (3) Sandoval's rape offenses before and after Lenney's murder, to determine whether a rape or attempted rape had occurred. For the reasons we have discussed, substantial evidence supported the jury's finding in the affirmative.

## DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

ARONSON, J.

10